

# NUMBER 13-23-00107-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**DANIEL DOMINQUE CHAPA,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

## ON APPEAL FROM THE 377TH DISTRICT COURT
## OF VICTORIA COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Peña**
**Memorandum Opinion by Justice Longoria**

Appellant Daniel Dominque Chapa was found guilty by a jury of murder, a first-degree felony, and was assessed a twenty-year sentence of imprisonment. *See* TEX. PENAL CODE ANN. § 19.02(c). In two issues, Chapa contends that the trial court abused its discretion (1) in overruling his motion for directed verdict and (2) in denying his request for a concurrent causation instruction. We affirm.

# I. BACKGROUND

The testimony and evidence at trial demonstrated that in the late evening of February 19, 2022, Tanisha Upton picked up her three teenage sons—Demytrus, Elijah, and Keymareon Williams—and their friend Jace Buckner from a carnival in Victoria, Texas. As Upton drove away from the carnival in her maroon Ford Expedition SUV, she was followed by a white Pontiac G6 sedan driven by Jacqueline Perez. Chapa sat in the front passenger seat next to Perez, and Jordyn Barefield sat behind Chapa in the back passenger seat. Marcus Rojas and two other boys sat to the left of Barefield.

Upton drove northbound on Lova Street while en route to drop off Buckner. At some point, Upton made a u-turn then stopped at a stop sign. Upton then continued driving southbound on Lova. Simultaneously, Perez continued driving northbound on Lova, and as the two vehicles crossed paths, Chapa and Barefield discharged firearms from inside Perez's sedan in the direction of Upton's vehicle. Surveillance video from a residence on Lova was admitted into evidence and depicted these events.[1] One bullet shattered the back-left passenger window of Upton's Expedition and struck Upton's head, just behind her left ear. Perez then continued driving northbound on Lova, away from the scene. The Expedition continued moving forward until it crashed into a fence. After the Expedition came to a stop, Upton's body was slumped against the steering wheel. Upton's sons then removed her from the vehicle and placed her on the ground just outside the driver's seat.

---

[1] The footage depicts Upton and Perez's vehicles as they pass one another. Flashes of light and auditory pops from the gunshots were also recorded in the footage. However, the footage is dark and no persons involved in the incident can be seen.

Eloy Luna, who lived nearby, spoke to a 9-1-1 dispatcher and informed them of the shooting. Victoria Police Department (VPD) patrol officer Michael Trejo was the first to arrive at the scene. Trejo observed Upton laying near her Expedition with blood coming out of her nose and down her face. Trejo could not find an entry wound and attempted CPR on Upton, but she was nonresponsive and later taken by EMS. Kelly Sebby, a crime scene technician with VPD, collected five shell casings found on the roadway of the 1200 and 1300 block of Lova, just north of the crime scene. According to Sebby, four of the shell chasings were determined to be .40 caliber and one was 9 millimeter. Sebby also recovered a bullet from the Expedition that was lodged inside the top of the rear passenger door frame, the caliber of which was undetermined.

Shane Collins, a VPD investigator, interviewed Upton's sons separately and learned that Demytrus was involved in a confrontation with Barefield and an unknown Hispanic male at the carnival prior to the shooting. Collins testified without objection that "Demytrus mentioned that he saw a clip or a magazine protruding out of . . . [Barefield]'s waistband, and that's why a fight didn't occur." Collins further testified that "[i]t all stemmed from [a] previous altercation at school involving [the] boys." Collins also interviewed Barefield, who provided two statements. In his first statement, Barefield denied any involvement, but identified Chapa as the sole shooter. However, Barefield provided a second statement in which he admitted to shooting towards Upton's vehicle with a nine-millimeter handgun, and that Chapa had a ".40 caliber Taurus G2C with an extended magazine." Collins testified that Barefield explained that "[h]e just recklessly put his hand out the back of the window . . . and he fired multiple rounds" "at or in the direction of

3

Upton's] vehicle as it passed by." However, Barefield also indicated that Chapa "protruded out of the window to the right and shot more precise shots."

Chapa was subsequently located and arrested. The G6 was later found parked at Chapa's apartment. Search warrants for Chapa's apartment and the G6 were executed, but no ammunition or firearms were found inside. However, two holes were observed in the rear spoiler of the G6, which Collins testified appeared to be where a bullet had entered and exited. Specifically, Collins stated that the entry into the spoiler was on "the vehicle side" or "cab side," and the exit was "going away from the vehicle." In addition, two .40 caliber bullet shell casings were found on the G6's exterior, "where the trunk meets the back window."

Timothy Fagen, the former medical examiner of Travis County, performed Upton's autopsy and found a single gunshot wound behind her left ear. Projectile fragments were recovered from the inside of Upton's head and neck, including the lead core and jacket of a bullet. Fagen determined that Upton's cause of death was a gunshot wound to the head, and the manner of death was homicide.

Carolyn Martinez, a firearm examiner for the Corpus Christi Police Department's Forensic Lab, stated she received seven fired casings from VPD, labeled Q1–Q7 in her report, which were admitted into evidence. Martinez testified that all casings sent to her were determined to be .40 caliber, except Q5 which was determined to be nine-millimeter. Martinez also testified that she received three fired "bullet fragments" from VPD, which were labeled QB1, QB2, and QB6 in her report. Martinez indicated that QB1 was retrieved from the inside of Upton's neck, but because QB1 lacked detail for comparison purposes,

4

she could not conduct any further analysis. QB2 was retrieved from the inside of Upton's head, and Martinez determined it was a .40 caliber bullet "consistent with a .40 caliber Glock pistol." However, Martinez indicated in her report that the possible firearms that could produce QB2 were not limited to "Glock .40 S & W pistols." QB6 was retrieved from the passenger door frame of Upton's Expedition. Martinez could not determine the exact caliber due to damage, but stated it was "mid-caliber, somewhere between a nominal .38 which could be a 9-millimeter or a .38 revolver caliber or a .40 caliber." Martinez indicated in her report that possible firearms that could produce QB6 could not be determined.

Rojas testified that he had been drinking alcohol and smoking marijuana with his friends on the day of the shooting. At some point, his friends woke him up and told him they were going to the carnival to go fight. Rojas stated that he, Perez, Chapa, Barefield, and two other friends got into Perez's G6 and drove to the carnival. Rojas stated that after waiting a few minutes in the parking lot, they saw the "people [they] were supposed to fight" get into an SUV. Barefield told Perez to follow the SUV. Rojas testified that he observed Chapa and Barefield shoot firearms at Upton's Expedition "out the window" and "on the windowsill" of Perez's G6. Rojas also stated that he did not have a firearm, and he saw no one else in the G6 with one. Rojas further testified that after the shooting, Perez and Chapa dropped him, Barefield, and the others off at a friend's house. According to Rojas, Barefield had a firearm with an extended clip at their friend's house, Barefield had told Rojas the gun was a "Glock .40," and Chapa had a similar gun.

Perez testified that she was Chapa's former girlfriend and that she picked up Chapa and Barefield from the carnival on the night of the shooting. Chapa sat next to her

in the front of her vehicle, and Barefield sat behind Chapa in the back. Chapa told her to pick up Rojas and the two other boys. Perez explained that she thought she was taking them to the carnival. Perez indicated she drove to the carnival and parked at the parking lot for a few minutes, and eventually left. Perez stated that she was not told to follow any vehicle, but was directed where to go—"like saying go straight"—and she thought she was dropping off "the other boys" to "the house they were staying at." Perez eventually heard multiple gun shots, "went into like a shock," accelerated, and drove off. Perez stated she did not know where the gunshots came from, but stated she noticed that, after hearing the gunshots, the "back right window" of her car was rolled down. Perez stated she did not know if the front passenger window was down and never saw it down. Perez further testified that she and Chapa went to his apartment after dropping off the others, and that she saw Chapa exit her car with a firearm tucked into his pants. Perez stated she went straight to bed and did not see what Chapa did with the firearm. According to Perez, there was something extending from the bottom of the gun, and she knew Chapa to have a firearm like the one she saw.

Barefield testified that he was involved in the shooting, pleaded guilty to manslaughter pursuant to a plea bargain, and was sentenced to twenty years' imprisonment. Barefield stated that prior to the shooting, Chapa called Rojas and the other boys and told them they were going "to go slide," which Barefield said means to fight. Subsequently, Perez, Chapa, and Barefield picked up Rojas and the other boys. Barefield stated that Chapa told Perez to follow Upton's Expedition. According to Barefield, as Upton drove past them after making a u-turn, Chapa handed him a firearm

6

and had one himself. Barefield stated he did not know what kind of firearm Chapa had but believed it was a .40 caliber and that Chapa handed him a nine-millimeter. Barefield stated he stuck his hand on top of the car and fired "two or three times" towards Upton's Expedition, but did not get out of Perez's vehicle. Barefield also stated that Chapa fired a few shots in the same manner, but then paused and put his body out of the window and sat on the window frame. Chapa then turned towards the direction of Upton's Expedition, had both hands on his firearm reaching over the top of Perez's vehicle, and fired several times towards the Expedition. After the shooting, Perez and Chapa dropped Barefield, Rojas, and the others off at a friend's house. Barefield stated that he did not have the firearm at his friend's house and that Chapa had taken both firearms before Barefield was dropped off. Barefield explained that he was later interviewed at the juvenile detention center and provided two statements. Barefield admitted that he did not put himself in Perez's car or claim responsibility for the shooting in his first statement, but was more truthful during his second statement.

The jury found Chapa guilty of murder and assessed a twenty-year sentence. This appeal ensued.

## II.    DIRECTED VERDICT

In his first issue, Chapa argues that the trial court abused its discretion in overruling his motion for directed verdict.

### A.    Standard of Review and Applicable Law

We first note that the abuse-of-discretion standard is not the appropriate standard of review for Chapa's directed verdict claim. In his brief, Chapa raises legal and factual

sufficiency arguments in connection to his issue. "[T]he law is well-settled that a challenge on appeal to the denial of a motion for a directed verdict is a challenge to the *legal* sufficiency, not the factual sufficiency of the evidence." *Turner v. State*, 101 S.W.3d 750, 761 (Tex. App.—Houston [1st. Dist.] 2003, pet. ref'd) (emphasis in original); *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App.1996) ("We treat a point of error complaining about a trial court's failure to grant a motion for directed verdict as a challenge to the legal sufficiency of the evidence."); *see also Brooks v. State*, 323 S.W.3d 893, 905–07 (Tex. Crim. App. 2010) (plurality op.) (holding legal sufficiency as the only standard of review appellate courts should use to evaluate whether the evidence is sufficient to support a criminal conviction beyond a reasonable doubt). Therefore, we review Chapa's issue on appeal under the same standard as a claim of legal sufficiency. *See id.*

In reviewing the legal sufficiency of the evidence to support a conviction, "we consider the evidence 'in the light most favorable to the verdict' to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Delagarza v. State*, 635 S.W.3d 716, 723 (Tex. App.—Corpus Christi–Edinburg 2021, pet. ref'd) (quoting *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020)); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We consider both direct and circumstantial evidence as well as any reasonable inferences that may be drawn from the evidence and are not mere speculation. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the factfinder is the exclusive judge of the facts, the credibility of the witnesses, and the weight

8

to give their testimony." *Delagarza*, 635 S.W.3d at 723 (first citing *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020); and then citing TEX. CODE CRIM. PROC. ANN. art. 38.04).

We measure the sufficiency of the evidence in reference to the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327 (quoting *Malik*, 953 S.W.2d at 240); *see Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000). The law as "authorized by the indictment" is comprised of the statutory elements of the offense "as modified by the charging instrument." *Curry*, 30 S.W.3d at 404.

A person commits murder if he "intentionally or knowingly causes the death of an individual" or "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that cause the death of an individual." *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (3). Here, the indictment alleged that Chapa "intentionally and knowingly cause[d] the death of . . . Upton, . . . by shooting [her] with a firearm." The indictment also alleged in the alternative that Chapa

> commit[ted] or attempt[ed] to commit an act clearly dangerous to human life, namely knowingly discharging a firearm at or in the direction of . . . Upton, that caused the death of . . . Upton, . . . and [Chapa] was in the course of intentionally and knowingly committing . . . Deadly

9

Conduct . . . , by discharging [ ]a firearm and the death of [Upton] was caused while [Chapa] was in the course of and in furtherance of the commission or attempt of [Deadly Conduct].

A person commits deadly conduct if he knowingly discharges a firearm at or in the direction of one or more individuals. *Id.* § 22.05(b).

A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). Intent may generally be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

A person is a party to an offense if "the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a); *see Adames v. State*, 353 S.W.3d 854, 861 (Tex. Crim. App. 2011). Under the law of parties, "a person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2). Thus, a hypothetically correct jury charge would state that Chapa was guilty of murder if, acting with the intent to promote or assist in the commission of the murder, he solicited, encouraged, directed, aided or attempted to aid Barefield to commit murder. *See id.* §§ 7.01(a), 7.02(a)(2), 19.02(b)(1).

## B.  Discussion

At trial, after the State rested its case in chief, Chapa moved for directed verdict, which was denied by the trial court. In his brief, Chapa argues that the trial court abused

10

its discretion in denying his motion because the State did not present a scintilla of evidence demonstrating that he "discharged a firearm during the commission of any deadly conduct." Chapa also argues that there was no testimony establishing that he "pointed the firearm at the victim and pulled the trigger." We disagree.

The evidence presented at trial demonstrated that Chapa and Barefield both fired gunshots from Perez's G6 toward Upton's Expedition on the night of the shooting. Forty caliber and nine-millimeter shell casings were found near the scene, and surveillance footage depicted the shooting. Both Rojas and Barefield testified that Chapa sat in the front passenger seat of Perez's G6 and that he fired gunshots towards Upton's vehicle. In addition, it was undisputed that Upton was killed by a single gunshot wound to the head, and a fragment of a .40 caliber bullet was retrieved from inside her head. While Rojas and Barefield's testimony differed regarding which type of firearm Chapa fired during the shooting—a .40 caliber or nine-millimeter—it was the jury's province to resolve those conflicts or inconsistencies, and we must defer to the jury's resolution of these issues. *See Brooks*, 323 S.W.3d at 899 (stating jurors are exclusive judges of facts, credibility of witnesses, and weight to be given to witnesses' testimony and appellate courts must defer to jury's determinations on these issues). The jury could have credited Barefield's testimony that Chapa shot the .40 caliber firearm, and thus found Chapa guilty as a principal to Upton's murder. Alternatively, the jury could have believed Barefield shot the killing blow but also found Chapa responsible as a party to the offense by aiding Barefield by providing him with a firearm—per Barefield's testimony—and by shooting a firearm towards Upton's Expedition himself. *See* TEX. PENAL CODE ANN. § 7.02(a)(2).

11

Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Chapa committed the offense of murder. *See Delagarza*, 635 S.W.3d at 723. Accordingly, we hold that the evidence is legally sufficient to support Chapa's conviction, and the trial court did not err in denying Chapa's motion for directed verdict. We overrule Chapa's first issue.

### III. JURY CHARGE INSTRUCTION

In his second issue, Chapa contends that the trial court erred by denying his requested jury charge instruction on concurrent causation.

### A. Standard of Review & Applicable Law

In reviewing claims of jury charge error, we use a two-step process. First, we determine whether error exists in the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error exists, we then determine whether it was harmful using the framework outlined in *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984). *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009).

We review a trial court's refusal to include a defensive issue in the charge for an abuse of discretion. *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000). An accused is entitled to an instruction on every defensive issue raised by the evidence. *Hayes v. State*, 728 S.W.2d 804, 807 (Tex. Crim. App. 1987); *see* TEX. CODE CRIM. PROC. ANN. art. 36.14 (providing that, in a felony jury trial, the court must deliver to the jury "a written charge distinctly setting forth the law applicable to the case"). This is true whether the evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the evidence. *Hamel v. State*, 916 S.W.2d 491,

12

493 (Tex. Crim. App. 1996). Indeed, the court must view the evidence in the light most favorable to the defendant's requested submission. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

Penal code § 6.04(a) provides that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04(a); *see Cyr v. State*, 665 S.W.3d 551, 557–58 (Tex. Crim. App. 2022). Thus, to be entitled to an instruction on concurrent causation, the defendant must specifically show that (1) "an agency in addition to the actor" was a "but for" cause of the result charged, and (2) some evidence demonstrates the defendant's conduct was clearly insufficient to cause the harm and the other concurrent cause was clearly sufficient to cause the harm. *Cyr*, 665 S.W.3d at 557–58.

Addressing confusion over the application of the concurrent causation instruction among lawyers and trial courts, the Texas Court of Criminal Appeals recently clarified the specific circumstances that raise the instruction:

> To illustrate: Two arsonists each light fire to the same house, one on the east side and one on the west side, both of which are independently sufficient to burn the house to the ground. Neither arsonist is entitled to an instruction on concurrent causation and both are criminally liable. The same result is reached if both fires would independently be insufficient to burn the house to the ground, but the combined force of the east fire and the west fire causes such a result. Only where the east arsonist can produce evidence that his fire was clearly insufficient to burn the house to the ground, and the west arsonist's clearly sufficient acting alone, would the east arsonist be entitled to an instruction on concurrent causation and potentially escape liability for the full extent of the damage caused under concurrent causation.

13

*Id.* at 557. In other words, if there are two causes, which both satisfy "but for" causation, a criminal defendant remains liable if his conduct was either sufficient to have caused the result "'regardless of the existence of a concurrent cause,' or both causes 'together' were sufficient to cause the result." *Briscoe v. State*, 676 S.W.3d 132, 138 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd) (citing *Cyr*, 665 S.W.3d at 557) (cleaned up). For this reason, the Texas Court of Criminal Appeals concluded that "[c]oncurrent causation should not be over construed to encompass culpability disputes appropriately addressed by the essential elements of the crime." *Cyr*, 665 S.W.3d at 562.

## B.      Discussion

At the charge conference, Chapa's counsel requested that the jury charge include a concurrent causation instruction "due to the fact that there was an inference of two bullets and two different guns that were used." Chapa's counsel further argued that "[i]f the jury were to believe that Mr. Barefield was, in fact, the shooter that shot the .40 caliber, then that would be a collateral causation to her death and Mr. Chapa could not be held responsible." The trial court denied the requested instruction.

As it applies to the facts of this case, a concurrent causation instruction was not required because there is no evidence that "two or more causes satisfy 'but for' causation." *See id.* at 557. The evidence established that both Chapa and Barefield discharged firearms during the shooting, and a fragment of a .40 caliber bullet was retrieved from inside Upton's head during the autopsy. While Rojas's and Barefield's testimony differed on whether Chapa possessed a .40 caliber or nine-millimeter firearm, it was undisputed that Upton was killed by a single gunshot wound to the head. No

14

evidence presented at trial established the existence of "two or more causes" of Upton's death. Moreover, there was no evidence establishing that Chapa's actions were "clearly insufficient" to cause Upton's death. *See* TEX. PENAL CODE ANN. § 6.04(a). Thus, the appropriate question for the jury was whether Chapa was criminally responsible for Upton's death, as a principal or party, and the culpability dispute was "appropriately addressed by the essential elements of the crime." *Cyr*, 665 S.W.3d at 562 (citing *Barnette v. State*, 709 S.W.2d 650, 652 (Tex. Crim. App. 1986)); *see* TEX. PENAL CODE ANN. §§ 19.02(b)(1), (3); 7.01(a).

We conclude the evidence did not raise the issue of concurrent causation, and the trial court did not err by denying Chapa's requested instruction. Having found no error, we hold that the trial court did not abuse its discretion. *See Ngo*, 175 S.W.3d at 743.

## IV. CONCLUSION

We affirm the judgment of the trial court.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
6th day of June, 2024.

15